UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

A1A BURRITO WORKS, INC., etc.,
et al.,

       Plaintiffs,

v.                                   CASE NO. 3:21-cv-41-TJC-JBT

SYSCO JACKSONVILLE, INC., etc.,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Defendant Sysco's Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") and Incorporated Memorandum of Law ("Motion") (Doc. 41), Plaintiffs' Response thereto (Doc. 42), and Defendant's Reply (Doc. 45).  The Motion was referred to the undersigned for a report and recommendation regarding an appropriate resolution.  (Doc. 46.)  For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that the Motion be **GRANTED** and that the SAC (Doc. 40) be **DISMISSED with prejudice**.

### I.    Summary of Recommendation

The undersigned recommends that the SAC pleads a claim that is "merely consistent" with Defendant's possible liability but "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Plaintiffs' claims are based solely on a relative handful (seventeen) of allegedly underweight packages of chicken, thirteen of which were weighed using Plaintiffs' apparently non-random, allegedly "commercially reasonable," weighing process done at the retail, rather than at the wholesale, level of distribution.[1]  (Doc. 40 at 4–7.)  Four of the seventeen packages were weighed by an inspector from the Florida Department of Agriculture and Consumer Services.  (Doc. 40 at 6–7.)  The factual examples pled appear both to suffer from selection bias and to be a fraction of the total number of packages received from Defendant over a period of more than a year.  (*Id.*; Doc. 41 at 4.)  Plaintiffs assert that the Court can reasonably infer from the allegations that Defendant is in violation of the detailed federal regulations governing the weighing process at the distribution level.   The undersigned recommends that this is not a reasonable inference based on the factual content pled.

Moreover, the undersigned recommends that the SAC be dismissed with prejudice.  At the hearing on Defendant's motion to dismiss a prior complaint, the Court made clear that Plaintiffs should set forth their best pleading to squarely present the issue of federal preemption.  (Doc. 30 at 63.)  Thus, the Court may

---

[1] Plaintiffs appear to be restaurants, and in that sense, are retailers.  (Doc. 40 at 8–10.)

fairly conclude that any further attempts to state a claim would be futile.

## II.     Background

Plaintiffs are three Florida corporations seeking to represent a class of "[a]ll Florida persons and entities that purchased Packaged Foods [(poultry)] from Sysco from December 1, 2016 to present, whose Packaged Foods were delivered under the advertised and represented weight." (Doc. 40 at 17.) The SAC asserts state law claims for violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq*., and breach of contract. (*Id*. at 20, 23.)

The SAC alleges that Defendant systematically misrepresented the weight of packaged chicken sold to the putative class, thereby overcharging the class for the actual quantity of chicken delivered. (*Id*. at 2.) It asserts that federal labeling law requires "the average net quantity of contents of Packaged Foods to be at least equal to the net quantity of contents declared on the label" and that Defendant's packages were regularly underweight as compared to their label in violation of federal law. (*Id*. at 3.) It specifically alleges seventeen examples of packages delivered by Defendant to Plaintiffs, over a sixteen-month timeframe, which Plaintiffs, and in four cases a state inspector, determined to be underweight. (*Id*. at 4–7.) It does not allege how many total packages Defendant shipped to Plaintiffs during that time, how the underweight packages were selected from that total for weighing, or the specific process by which those packages were weighed.

3

Defendant's labeling practices are governed by federal statutes that expressly preempt states from imposing any requirements "in addition to, or different than" federal regulatory requirements. *See* 21 U.S.C. § 467e. The federal regulations incorporate weighing procedures contained in the National Institute of Standards and Technology Handbook 133 ("Handbook") published by the U.S. Department of Commerce. 9 C.F.R. § 442.2.

Defendant argues that Plaintiffs' state law claims are preempted because they would impose standards on Defendant that are "in addition to or different from" those required by federal law. (Doc. 41 at 7.) Defendant contends that Plaintiffs' procedures for testing the net weight of Defendant's packages are necessarily different than those governing Defendant. (*Id.*) In response, Plaintiffs argue that the SAC does not "seek to change or add to the federal laws and regulations," but to hold Defendant to their "exact same standards." (Doc. 42 at 11.) Plaintiffs further argue that the results of the state inspection of four of Defendant's packages "confirms that [Defendant's] conduct is not only unlawful **but also ongoing**." (*Id.* at 6.)

On June 21, 2021, the Court heard oral argument on the issue of preemption, among others, during which the Court instructed Plaintiffs to file "an amended complaint that is . . . their best case as to what they can plead [for] a determination on this preemption issue." (Doc. 30 at 63.) The Court emphasized

4

that Plaintiffs should present their best pleading.  (*Id.* at 64–68.)  Following the hearing, Plaintiffs filed an Amended Complaint on August 2, 2021 (Doc. 35), and the SAC on September 13, 2021 (Doc. 40).

### III.   Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court must determine whether the Amended Complaint sets forth sufficient factual allegations to establish a claim upon which relief can be granted.  In evaluating whether Plaintiffs have stated a claim, the Court must determine whether the Amended Complaint satisfies Federal Rule of Civil Procedure 8(a)(2), which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

To satisfy this standard, a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556.  "Labels and conclusions" or "a formulaic recitation of the elements of a cause of action" that amount to "naked assertions" will not do.  *Iqbal*, 556 U.S. at 678.  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Though detailed factual allegations are not required to satisfy this standard, Rule 8(a) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*  Indeed,

allegations showing "[t]he mere possibility the defendant acted unlawfully [are] insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009); *see also Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'").  Rather, the well-pled allegations must nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In ruling on a motion to dismiss under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. *Sinaltrainal*, 578 F.3d at 1260.  Although the Court must accept well-pled facts as true, it is not required to accept Plaintiffs' legal conclusions. *Iqbal*, 556 U.S. at 678 (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  In evaluating the sufficiency of a plaintiff's pleadings, a court is "not required to draw plaintiff's inference." *Sinaltrainal*, 578 F.3d at 1260 (internal citation and quotations omitted).  "Similarly, unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations." *Id.* (internal citation and quotations omitted); *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

6

## IV.    Analysis

The undersigned recommends that Plaintiffs' claims are preempted because Plaintiffs' allegations, based solely on retail level testing, are insufficient to support a conclusion that Defendant's labels are misleading according to federal law.  The SAC demonstrates that Plaintiffs' process is materially different than that governing Defendant.    For example, Plaintiffs did not follow, or followed different, requirements regarding inspection lots, random sampling, and evaluating average net weight.  In effect, Plaintiffs are comparing apples and oranges.

The undersigned further recommends that the state inspection of four packages, although significant, does not change this analysis because this testing was also done at the retail level, the sample size was exceedingly small, and there are no allegations of any follow-up investigation at Defendant's level of distribution. Finally, because amendment would be futile, dismissal with prejudice is recommended.

### A.    The PPIA and the Handbook

The Poultry Products Inspection Act ("PPIA") contains an express preemption clause whereby "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, *or different than*, those made under this chapter may not be imposed by any State."  21 U.S.C. § 467e (emphasis added).  In persuasive cases applying this preemption language, the Ninth Circuit Court of

7

Appeals has held that state law claims seeking to impose liability for a misleading label statement, based on a "different data collection protocol" than that required of a defendant by federal law, would necessarily impose "additional" or "different" requirements and are expressly preempted.  *See Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021) (applying preemption where plaintiff could not show that the defendant's labels were misleading using defendant's own federally approved testing protocols); *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1290 (9th Cir. 2021) (holding that federal approval of a label preempts any state law claim that the label is misleading).[2]  Therefore, to avoid preemption in this case, Plaintiffs must plausibly allege that the process they used in testing Defendant's compliance with its net weight label statement is the same as that governing Defendant.  *See Webb*, 999 F.3d at 1204 ("[T]he only possible 'narrow gap' where Webb's claims might not be preempted would be if she could plausibly claim she used Trader Joe's exact data collection protocol and yet obtained different results, thereby evincing that Trader Joe's is misrepresenting its data to [the Food Safety

---

[2] The SAC is silent about whether the labels on the subject packages indicated a federal inspection.  Defendant, however, attached a sample label to the Motion indicating an inspection by the United States Department of Agriculture.  (*See* Doc. 41-2.)  Defendant asserts that "on each occasion, the products [Plaintiffs] received from Sysco bore a label like the one attached as Exhibit 2."  (Doc. 41 at 3–4.)  Plaintiffs do not appear to refute that their packages had this label.  Rather, Plaintiffs argue only that "no federal inspectors inspected or approved each package weight to ensure the labeled weight was accurate."  (Doc. 42 at 14–15.)  However, weighing every single package at the distribution level is not required by the Handbook and appears to be impractical.

and Inspection Service].").

The process for determining compliance with a net weight label is prescribed by federal regulation, which expressly incorporates the standards set forth in the "Handbook . . . , Fourth Edition, January 2005," with listed exceptions.  9 C.F.R. § 442.2.  The Handbook's comprehensive requirements set forth the following basic overall procedural steps: "1. Identify and define the inspection lot.  2. Select the sampling plan.  3. Select the random sample.  4. Measure the net contents of the packages in the sample.  5. Evaluate compliance with the Maximum Allowable Variation (MAV) requirement.   6. Evaluate compliance with the average requirement."[3]  Handbook, Ch. 2.3.

The Handbook also explains the merits of testing along different levels of the supply chain—i.e., point-of-pack, wholesale, and retail—and emphasizes the need for follow-up when retail testing is used:

> Testing packages at retail outlets evaluates the soundness of the manufacturing, distributing, and retailing processes of the widest variety of goods at a single location.  It is an easily accessible, practical means for State, county and city jurisdictions to monitor packaging procedures and to detect present or potential problems.   Generally, retail package testing is not conducive to checking large quantities of individual products of any single production lot. *Therefore, follow-*

---

[3] The most recent edition of the Handbook has a slightly different arrangement of the steps.  *See* Handbook, Ch. 2.3 (2020).  In comparing the relevant sections of both editions, neither provides greater support to Plaintiffs' claims than the other.   For consistency, quotations from the Handbook are taken from the Fourth Edition (2005).

> *up inspections of a particular brand or lot code number at a number of retail and wholesale outlets, and ultimately at the point-of-pack are extremely important aspects in any package-checking scheme.  After the evaluation of an inspection lot is completed, the jurisdiction should consider what, if any, further investigation or follow-up is warranted.  At the point-of-sale, a large number of processes may affect the quality or quantity of the product.  Therefore, there may be many reasons for any inspection lot being out of compliance.* A shortage in weight or measure may result from mishandling the product in the store, or the retailer's failure to rotate stock. Shortages may also be caused through mishandling by a distributor, or failure of some part of the packaging process.  Shortages may also be caused by moisture loss (desiccation) if the product is packaged in permeable media.  *Therefore, being able to determine the cause of an error in order to correct defects is more difficult when retail testing is used*.

*Id.* at Ch. 1.1 (emphasis added).

Regarding the average requirement, the Handbook states:

> The net quantity of content statement must be "accurate," but reasonable variations are permitted.  Variations in package contents may be a result of deviations in filling. The limits for acceptable variation are based on current good manufacturing practices in the weighing, measuring, and packaging process.  The first requirement is that accuracy is applied to the average net contents of the packages in the [inspection] lot.

*Id.* at Ch. 1.2.  In addition to the average requirement, there is also an individual package requirement, whereby an under-filled package cannot exceed a "Maximum Allowable Variation" ("MAV").  *Id.*

Finally, regarding the importance of random sampling:

10

> A randomly selected sample is necessary to ensure statistical validity and reliable data. This is accomplished by using random numbers to determine which packages are chosen for inspection. Improper collection of sample packages can lead to bias and unreliable results.

*Id.* at Ch. 1.3.

### B.   Plaintiffs' Allegations

Plaintiffs allege in vague, conclusory terms that they "undertook a good-faith, commercially reasonable weighing process consistent in all material aspects" with the Handbook.  (Doc. 40 at 4.)  The only description of that process is that Plaintiffs "considered the maximum and minimum allowable variations of weight for the type of Packaged Food, whether the product was frozen or thawed, and the tare weight (i.e., packaging)."[4]  (*Id.*)

The SAC lists thirteen examples of packages received from April 2020 to May 2021 that were allegedly underweight based upon retail-level testing.  (*Id.* at 4–6.)  It alleges further that a state inspector tested and failed four additional packages in August 2021.  (*Id.* at 6–7; Doc. 40-2.)  The SAC does not, however, indicate what other aspects of the Handbook, which contains many other technical requirements, Plaintiffs consider to be "material."  Likewise, it does not indicate the

---

[4] As an example of a defect in Plaintiffs' allegations, there appears to be no "minimum" allowable variation.  The allegation appears nonsensical because it implies that a variation from the package label *must exceed* some minimum amount.

total number of packages received from Defendant during the relevant time period, how the underweight packages were selected from that total for testing (whether there was a random sample taken from a defined inspection lot), or that Plaintiffs obtained average weights of multiple packages.   Rather, it appears that the allegedly underweight packages were not selected randomly but were "cherry-picked."   For example, on a date that Plaintiffs received two allegedly underweight packages (May 18, 2020), they apparently received six more packages of the same type.   (Doc. 41 at 4; Doc. 41-1 at 4, 8.)   It would be unreasonable to infer that the other six were also underweight when Plaintiffs could have pled that. Further, Plaintiffs do not rebut Defendant's arguments that their selection of tested packages was biased.   (See Doc. 42; Doc. 41 at 4–5, 14–15.)

### C.   Plaintiffs' Allegations Are Insufficient Because They Stop at the Retail Level of Testing

As the Handbook illustrates, the weighing process at the retail level is simply different than at the point-of-pack and wholesale levels.   At the retail level, for example, the inspection lot size is generally much smaller, the number of packages inspected is smaller, and there may not be a random selection.   Further, "there may be many reasons for any inspection lot [at the retail level] being out of compliance."   Handbook, Ch. 1.1.   Regarding Plaintiffs' testing, there appears to have been no random sampling, there are no non-conclusory allegations regarding MAV, and there are no allegations about average weights.

12

Plaintiffs argue in part that they adequately alleged that Defendant's packages fail federal standards because a state inspector tested four packages pursuant to Florida's Weights and Measures Law, Fla. Stat. § 531, and found them to be underweight.   (Docs. 40 at 6–7, 40-2, 42 at 6.)   States have concurrent jurisdiction, subject to preemption, from which their authority to conduct testing at the retail level is derived.   *See* 21 U.S.C. § 467e.   The PPIA's express preemption statute provides:

> [A]ny State . . . may, consistent with the requirements under this chapter exercise concurrent jurisdiction with the Secretary over articles required to be inspected under this chapter for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an [official] establishment, . . .[5]

*Id.*

The Handbook recognizes the role of state and local inspectors in the overall regulatory scheme:

> Packaged goods produced for distribution and sale also come under the jurisdiction of State and local weights and measures agencies that adopt their own legal requirements for packaged goods.   Federal statutes set requirements that pre-empt State and local regulations that are or may be less stringent or not identical to Federal regulation depending on the Federal law that authorizes the Federal regulation.   The application of

---

[5] "The term 'official establishment' means any establishment as determined by the Secretary at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained under the authority of this chapter."   21 U.S.C. § 453(p).

> [Handbook] procedures occurs in the context of the concurrent jurisdiction among Federal, State, and local authorities. . . . [T]he requirements of this handbook [] must be used when testing products concurrently subject to pre-emptive federal regulations.

Handbook, Ch. 1.4

In this case, the state inspection, although significant, only goes so far.  It was also done at the retail level and was based on an apparently non-random sample of four packages.  (*See* Doc. 40-2.)  No follow-up at the wholesale level is alleged.  The Handbook provides: "Wholesale testing is a very good way . . . to follow up on products suspected of being underfilled based on consumer complaints or findings made during other inspections, including those done at retail outlets."   Handbook, Ch. 1.1.   The Handbook further states that "follow-up inspections . . . are extremely important aspects in any package-checking scheme."   *Id.*   Thus, it was up to the state to "consider what, if any, further investigation or follow-up [was] warranted" based on the limited sample size and other pertinent circumstances.  *Id.*  From the allegations, all the state inspector did in this case was determine that four packages could not be sold.  The "Stop Sale Orders" he issued were directed to Plaintiffs, not Defendant.  (Doc. 42-2 at 4, 6.)  The state inspector did not cite Defendant for any type of violation, or, so far as the allegations show, initiate any further investigation.  This appears understandable

14

given the limited, and apparently non-random, sample that he was given.[6]

In sum, Plaintiffs ask the Court to make an inferential leap that, from the limited sample of underweight packages at the retail level, the Court can reasonably infer that Defendant's wholesale process is somehow flawed or suspect, and thus, Defendant is liable for misleading labeling. The undersigned recommends that this is a bridge too far. The testing at the retail and wholesale levels is too different, the sample size at the retail level in this case was too small and too biased, and as the Handbook notes, there may be many reasons for a small retail lot being out of compliance. Handbook, Ch 1.1. Thus, the undersigned recommends that the allegations in the SAC, even considering the state inspection, do not nudge Plaintiffs' claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### D.     The Breach of Contract Claim

A breach of contract claim is not necessarily preempted by PPIA because Defendant may have voluntarily taken on additional obligations by contract. *See Kuenzig v. Kraft Foods, Inc.*, No. 8:11-cv-838-T-24TGW, 2011 WL 4031141, at *7 (M.D. Fla. Sept. 12, 2011) ("The Court notes that generally an express warranty claim would not be preempted by the . . . PPIA, because an express warranty claim

---

[6] The SAC is noticeably silent on how the state inspection arose. The attached Package Inspection Summaries indicate only "Type: Scheduled." (Doc 40-2 at 2–3.)

merely holds the defendant responsible for delivering the product as warranted."). However, the contract terms at issue here expressly invoke the same federal requirements that determine preemption: "Sysco represents and warrants that all Products . . . will not be adulterated or misbranded within the meaning of the [Federal Food, Drug, and Cosmetic Act]."  (Doc. 40 at 24; Doc. 40-1 at 17.) Therefore, the preemption analysis for this breach of contract claim is the same as that for the FDUPTA claim—Plaintiffs must plausibly allege that Defendant's labels are misleading as defined by federal law.  As previously discussed, they have not done so.

### E.    Plaintiffs' Other Arguments

Plaintiffs advance several other arguments besides that their weighing process was consistent with that governing Defendant.  First, in somewhat contradictory fashion, Plaintiffs allege, and argue, that the Handbook's rules do not govern them, as customers, but apply only to Defendant.  (Doc. 40 at 3; Doc. 42 at 12.)  However, this argument further reinforces the point that Plaintiffs' weighing process is different than that governing Defendant.  Further, it is the process applicable to Defendant that is at issue in determining whether Defendant is liable for violating federal requirements.  In short, this argument appears to undercut, not support, Plaintiffs' claims.

Plaintiffs also argue that their examples of underweight packages violate the

MAV requirement.  (Doc. 42 at 5–6.)  However, except for the state testing, the SAC itself alleges only that the subject packages were underweight, not that they violated specific MAV standards governing Defendant.[7]  (*See* Doc. 40.)  Moreover, for all the reasons previously discussed, Plaintiffs are comparing apples and oranges by seeking to substitute retail-level testing for distribution-level testing. Thus, realleging the SAC to specify any MAV violation would not cure the bigger problem that Plaintiffs' allegations rely solely on retail level testing.

Finally, Plaintiffs advance a policy argument that applying preemption in this case would give Defendant "absolute immunity from any claims about underweight poultry."  (Doc. 42 at 6.)  However, such an outcome is not the necessary result of granting the Motion under the specific allegations in the SAC.  Thus, the Court need not take the position that all claims of this nature are categorically barred.  As previously stated, Plaintiffs rely on a relative handful of non-random weights at the retail level and nothing else.  That is the claim the Court is ruling on.  Moreover, even if Plaintiffs' claims and almost all similar claims would be barred due to preemption, (1) customers may seek greater contractual protections that do not rely on federal standards for mislabeling, (2) customers may notify state and federal inspectors if mislabeling is suspected,[8] and (3) a lack of certain state

---

[7] The state inspector's summary does indicate that the four selected packages violated the MAV at the time and location of that testing.  (Doc. 40-2 at 2–7.)

[8] For example, the Stop Sale Order in this case indicated that Plaintiffs could gain

consumer remedies under the regulatory scheme is consistent with congressional goals of national uniformity in labeling requirements.  As the court stated in *Cohen*:

> Cohen's *policy* arguments against preemption are not only irrelevant, but also unpersuasive.  The absence of a remedy for consumers in the PPIA is intentional.  *See* 21 U.S.C. § 467d.  Congress granted a federal agency the authority to uniformly determine the standard for poultry mislabeling and to apply that standard to labels before they go to market.  *See* [*Nat'l Broiler Council v.*] *Voss*, 44 F.3d [740, 744 (9th Cir. 1994)].  Allowing private consumers to second-guess the agency's decisions through state law claims against producers would both circumvent that pre-approval process and conflict with the PPIA's goal of national uniformity.

*Cohen*, 16 F.4th at 1288.

### F.    Dismissal With Prejudice

The undersigned recommends that the SAC be dismissed with prejudice.  At the hearing, Plaintiffs were instructed to set forth their best pleading to squarely present the issue of preemption.  (Doc. 30 at 63.)  Eighty-four days and two amended complaints later, the SAC lacks sufficient allegations that Plaintiffs' claims are not preempted.  Accordingly, the undersigned recommends that the Court can reasonably conclude that further amendment would be futile.  *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1163 (11th Cir. 2019) (affirming dismissal with prejudice based on futility of amendment).

---

release of the product in part by returning it to the manufacturer.  (Doc. 40–3 at 4, 7.)

## V.      Conclusion

In their "best" attempt, Plaintiffs fail to plausibly allege that Defendant's labels are misleading according to federal standards.  (*See* Doc. 30 at 63.)  Thus, their claims are preempted.  Moreover, amendment would be futile.

Accordingly, it is respectfully **RECOMMENDED** that:

1.      The Motion (**Doc. 41**) be **GRANTED**.

2.      The SAC (**Doc. 40**) be **DISMISSED with prejudice** and judgment be entered accordingly.

### Notice to Parties

"Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2).  "A party may respond to another party's objections within 14 days after being served with a copy."  *Id.*  A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made.  *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**DONE AND ENTERED** in Jacksonville, Florida, on February 8, 2022.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Timothy J Corrigan
Chief United States District Judge

Counsel of Record

20